## PUBLIC SERVICE RAILWAY COMPANY v. BOARD OF PUBLIC UTILITY COMMISSIONERS AND CITY OF PATERSON.

Argued December 12, 1915—Decided June 23, 1916.

The provisions of section 2 of the supplement to an act concerning public utilities, approved March 12th, 1913 (Fielder act, *Pamph. L.* 1913, *p.* 91), by which ten per centum of the expense of eliminating a grade crossing of a steam railroad used by a street railway may be ordered to be paid by the company operating such street railway, is within the legitimate sphere of legislation under the police power of the state.

---

On *certiorari.*

The order of the board of public utility commissioners, drawn under review as to one of its terms by this *certiorari,* is fully set out in the statement of facts prefaced to the opinion delivered at this term in the case of Erie Railroad Co. *v.* Board of Public Utility Commissioners.

Before Justices GARRISON, TRENCHARD and BLACK.

For the prosecutor, *Frank Bergen.*

For the defendants, *Edward F. Merrey* and *Frank H. Sommer.*

The opinion of the court was delivered by

GARRISON, J.   The prosecutor of this writ, the Public Service Railway Company, objects to the order of the board of public utility commissioners imposing upon the prosecutor ten per centum of the cost incurred in abolishing grade crossings on three highways over which the prosecutor operates its cars.   The reasons relied on by counsel, "briefly stated, are, that the burden which the order attempts to impose on the prosecutor is neither a tax nor an assessment, nor a legitimate exercise of the police power."   Inasmuch as the order merely follows the statute, the attack is really upon the latter.   The language of the statute is, that "the board may order not exceeding ten per centum of such expense directly chargeable to the crossing used by the street railway company to be paid by the company operating such street railway."

We agree that this imposition of a part of the expense of abolishing dangerous grade crossings is neither a tax nor an assessment for a public improvement, but, we think, that it is a legitimate exercise of the police power.   The contention of counsel for the prosecutor is placed squarely upon the proposition that the police power is not legitimately exercised in the present case "unless the property (of the prosecutor) has become a public nuisance, and so lost its right to protection;" and he then proceeds to demonstrate that a street railway is not a public nuisance.   We, of course, agree to this, but we entirely dissent from the narrow definition of the police power which would restrain its exercise to the case of property that had become in a legal sense a nuisance.

If such a narrow definition has any place in the doctrine of the police power (it is confined to the appropriatory aspect of that power), *i. e.*, to such appropriation as is incidental to the destruction of property as a nuisance and has no place in the vastly wider scope of such power that is regulative of energies that are curbed, not that they may be impaired or destroyed, but, on the contrary, that they may be of greater service and beneficence to the public.

Instances of such regulative exercises of the police power are met at every turn and constitute in fact the chief char-

acteristics of modern social life.    There are, to use a rough analogy, two aspects of the exercise of the police power, one, so to speak, *in rem,* and the other *in personam;* and it is to the former alone that the proposition of counsel has any possible pertinence, and, even in that connection, it is of doubtful value as a definition, and of no apparent service as a criterion.

The distinction between these two aspects of the police power is perfectly patent.    The destruction of a pest house would be an illustration of appropriation of property because it was *per se* a nuisance, *i. e.,* a menace to the public health, while the compulsory vaccination of school children would be in order to prevent them from becoming such.    The securing of public safety from anticipated dangers, rather than the abatement of consummated nuisances, is the essence of the police power in its broader scope.    That there are such dangers to be anticipated from the operation at a grade crossing of a steam railroad and a trolley line is not more obvious than that each of these public agencies contributes its element to such danger.    The steam road may, indeed, furnish in greater degree the active element of danger to human life, but the surface road in its operation brings to such place of danger its human freight in extraordinary numbers and under special conditions, which, or so the legislature might determine, greatly increase and accentuate the normal danger, and hence justify its elimination by the joint act or at the joint expense of both of the public agencies that contribute in its production.    It is matter of common knowledge that during what are termed the rush hours of the day a single surface car of modern construction carries a hundred or more passengers, and that the cars thus crowded follow each other in an almost unbroken procession.    The stalling of one of these cars upon a grade crossing by the sudden giving out of the electric current, or its propulsion on to the railroad track by the failure of a brake to work properly, or, as in the Newark case *(State* v. *Young, 56 Atl. Rep.* 471), by the failure to sand the track, would imperil the lives of scores, who were brought into such position of peculiar peril by reason of being passengers on a street railway.    It is not at all

a question of the creating of a common nuisance, but solely of the participation in and contribution to a common source of danger arising from the transportation problem in its relation to grade crossings of common carriers of passengers.

The state grants this use of its highways for the convenience of its citizens, and the incorporators of such companies eagerly seek the privileges thus granted because of the profits to be derived therefrom; hence, if dangers arise from the very success of such enterprises, it is eminently within the exercise of the police power of the state in the elimination of such dangers to place a portion of the expense of so doing upon those who profit by the very success which has contributed to such dangers.

The fact that by such a collision as we have suggested the lives of the passengers on the steam railroad are also imperiled, so far from demonstrating that the entire expense of eliminating the dangerous condition should be borne by such railroad, merely emphasizes the participation of each carrier in the production of a common source of danger, and hence points to their joint contribution to the expenses of its elimination.

In support of this obvious conclusion, counsel for the defendant cites a number of pertinent authorities, but the question would seem to be at bottom one of fact, from which, when the fact is once established, the legal result follows as a necessary consequence. The establishment of such fact is, moreover, a part of the legislative function, and as such is not subject to review by the judicial department.

In *Hopper* v. *Stack,* 69 *N. J. L.* 562, 567, we said: "Every exercise of the police power involves, of necessity, the determination by the lawmaker of some fact quite apart from the exercise of any legislative discretion concerning it," and illustrations of such determinations of fact were given and the matter discussed at some length.

The proposition thus advanced has been not only adopted by the Court of Errors and Appeals, but has been elevated into a presumption. "Police regulations of this character," said Chancellor Pitney, in *Meehan* v. *Excise Commissioners,*

75 *N. J. L.* 557, 562, "must, in the absence of clear evidence to the contrary, be deemed to be based upon facts within the possession of the legislature rendering such legislation proper, if not necessary. See *Hopper* v. *Stack*, 40 *Vroom* 562." And, in *State* v. *Sutton*, 87 *N. J. L.* 192, 193, also a Court of Errors and Appeals decision, a condition that would justify the exercise of the police power, was spoken of as "one of those determinations of fact that the legislature has the right to make for itself when prescribing a police regulation," citing *Hopper* v. *Stack* and *Lyons* v. *Morris County*, 86 *Id.* 206. It is this prerogative of the legislative department of the government thus to predicate its exercise of the police power of the state upon facts within its own possession and keeping that renders such power so unamenable to precise judicial definition rather than any inherent difficulty in defining the limits of such power when applied to a given state of facts.

The foregoing remarks, coupled with our discussion of the topic and citation of authorities in the case of Erie Railroad Co. *v.* Board of Public Utility Commissioners, decided at this term, lead to the conclusion that the provision of the Fielder act drawn under review was within the proper sphere of legislation, and that the order of the utility board brought up by this *certiorari*, merely carried out the clearly-expressed intent of the legislature. That the state, through its chosen agencies, is not required in such a situation to ascertain the exact quota of contribution to a common danger, and by that standard assign the expense of its elimination, is borne out by the cases cited by counsel for the defendant. Under such circumstances, the province of the judicial office is thus stated by Chief Justice Beasley in *Douglass* v. *Essex County*, 38 *N. J. L.* 214: "Where that which is directed to be done is within the sphere of legislation, and the terms used clearly express the intent, all reasoning derived from the supposed inconvenience, or even absurdity of the result, is out of place. It is no province of the courts to supervise legislation and keep it within the bounds of propriety and common sense, so that even if in this case it could be demonstrated that the regulation in question was incommodious, or even hurtful, an

appeal for relief to the judicial power would be utterly in vain." This is stronger language than is called for by the circumstances of the present case, but the rule of law to which it leads up cannot be too strongly stated, or too rigidly observed if the relative spheres of the legislative and judicial departments of the government are to be kept separate in obedience to the constitutional mandate.

The order of the utility board brought up by this writ is affirmed, with costs.