ROSE BUCSI, PLAINTIFF-APPELLANT, v. LONGWORTH BUILDING AND LOAN ASSOCIATION, DEFENDANT-RESPONDENT.

Submitted May 31, 1935; Re-argued as No. 1, May 22, 1936—Decided October 26, 1937.

For the plaintiff-appellant, *John A. Bolger.*

For the defendant-respondent, *John Warren* and *David J. Wilentz,* attorney-general, *amicus curiæ* (*Louis J. Cohen,* assistant attorney-general, and *Merritt Lane,* of counsel).

The opinion of the court was delivered by

CAMPBELL, CHANCELLOR. An action was brought for the purpose of recovering the withdrawal value of ten installment

shares of the stock held by the plaintiff-appellant in the Niagara Building and Loan Association, which, on December 31st, 1932, was consolidated and merged with the Longworth Building and Loan Association, the defendant-respondent. This stock was subscribed for June 17th, 1919. Written notice of withdrawal was given on June 15th, 1931, and on subsequent dates prior to October 15th, 1931, and the action in question was commenced January 19th, 1934. In her complaint the appellant rested her right of action upon the ground that she was entitled to payment according to the terms and provisions of the statute existing at the time she subscribed for the shares in question. This was *Pamph. L.* 1903, *p.* 457. The statute in effect at the time she gave notice of her withdrawal was *Pamph. L.* 1925, *ch.* 65, *p.* 189. The terms and provisions of both of these statutes, as to the question of withdrawal, are, to all intents and purposes. alike.

Between the date of giving her notice of withdrawal and the commencement of her suit *Pamph. L.* 1932, *ch.* 102, and *Pamph. L.* 1933, *chs.* 48, 166 and 258 had been adopted and become effective. *Pamph. L.* 1932, *ch.* 102, became effective April 22d, 1932, and *Pamph. L.* 1933, *chs.* 48, 166 and 258 became effective March 10th, 1933, May 11th, 1933, and June 21st, 1933, respectively.

The appellant appears to contend that whether the act of 1903 or 1925, *supra,* controlled, she was entitled to have her action December 15th, 1931.

In its answer the defendant-respondent pleaded, among other things, all of these statutes and certain orders of the commissioner of banking and insurance issued pursuant to the 1933 acts, and reserved the right to move to strike the complaint as not setting up a cause of action. Plaintiff-appellant moved to strike the answer and upon the coming on of the hearing of such motion before the Circuit Court judge, sitting under the statute, as a Supreme Court commissioner, the defendant-respondent moved to strike the complaint and prevailed, and from the judgment entered the plaintiff below appeals and urges and argues four grounds for reversal:

1. That *Pamph. L.* 1932, *ch.* 102, is not retrospective.

2. That *Pamph. L.* 1932, *ch.* 102, if retrospective is unconstitutional.

3. That *Pamph. L.* 1932, *ch.* 102, is not an emergency act.

4. That the orders issued by the commissioner of banking and insurance under *Pamph. L.* 1933, *chs.* 48, 166 and 258 are invalid and without effect and the statutes are unconstitutional as being an improper delegation of legislative powers.

Counsel for appellant concedes in his brief that if *Pamph. L.* 1932, *ch.* 102, *supra,* or the orders of the commissioner of banking and insurance issued under the 1933 statutes, *supra,* are controlling, then appellant's complaint failed to state a cause of action.

The first three points urged for reversal can, most conveniently, be considered together.

First, it is urged that the 1932 act is not emergency legislation because it does not recite the existence of an emergency and is not limited in its existence to the period of any emergency but forms a permanent part of the statutes relating to and regulating building and loan associations. This, in the cause before us, is not necessary. A legislative declaration of the existence of an emergency is entitled to judicial consideration but the courts must be guided by what is common knowledge. *Home Building and Loan Association* v. *Blaisdell,* 290 *U. S.* 398; 54 *Sup. Ct. Rep.* 231; 78 *L. Ed.* 413.

Further, an emergency does not create or bestow legislative power, not otherwise constitutionally existing, but it may furnish the occasion and necessity for the exercise of such power. *Home Building and Loan Association* v. *Blaisdell, supra; People* v. *Title Mortgage and Guaranty Co.,* 264 *N. Y.* 69; 190 *N. E. Rep.* 153, 156; *Hourigan* v. *North Bergen,* 113 *N. J. L.* 143, 151.

It must be noted that this statute does not, by its terms, limit its operation to the period of an existing emergency and this reason takes it out of the class of mere emergency legislation—so called. But it is unnecessary to sustain the statute on the temporary ground that it is an emergency statute, because it is sustainable on broad constitutional grounds as a valid exercise of the reserved power of the state.

This so-called reserved power is generally referred to as the police power of the state and extends to all great public needs. *Noble State Bank* v. *Haskell,* 219 *U. S.* 104, 110; 55 *L. Ed.* 112; 31 *Sup. Ct. Rep.* 486. What are the police powers of the state?

Mr. Justice Taney, in *The License Cases, 5 Howard* 504, 583; 12 *L. Ed.* 256, 291, said:

"They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a state passes a quarantine law, or a law to punish offenses, or establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution of the United States." *Nebbia* v. *New York,* 291 *U. S.* 502, 524; 78 *L. Ed.* 940; 54 *Sup. Ct. Rep.* 505.

It is well settled, however, that the constitutional interdiction against statutes impairing the obligation of contracts does no prevent the state from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into may thereby be effected. *Home Building and Loan Association* v. *Blaisdell, supra* (at *p.* 437); *Manigault* v. *Springs,* 199 *U. S.* 473; 50 *L. Ed.* 274; 26 *Sup. Ct. Rep.* 127. But the exercise of such powers is subject to the limitation that it must be reasonable under the conditions and the legislation must have a substantial relation to its object and must not be arbitrary or discriminatory. *Wolf Packing Co.* v. *Court of Industrial Relations,* 262 *U. S.* 522, 535; 43 *Sup. Ct. Rep.* 630; 67 *L. Ed.* 1103; *Nebbia* v. *New York,* 291 *U. S.* 502 (at *p.* 535); 54 *Sup. Ct. Rep.* 505; 78 *L. Ed.* 940.

This power is an attribute of sovereignty and all contracts

are subject to its future exercise, and not only existing laws but also laws resulting from the exercise of this reserved power are read into and made a part of all contracts. *Home Building and Loan Association* v. *Blaisdell, supra; Norman* v. *Baltimore and Ohio Railroad Co. et al.,* 294 *U. S.* 240; 79 *L. Ed.* 885; 55 *Sup. Ct. Rep.* 407; *Hourigan* v. *North Bergen, supra; People* v. *Title Mortgage and Guaranty Co., supra.*

It is a matter of such common knowledge as to require judicial notice that the operation of building and loan associations in this state during the latter part of the last century had been so loose and utterly devoid of any consideration of the purpose for which they were created and the rights of the subscribing members that the situation was a public scandal and called for action on the part of our legislature. The legislature of 1903 undertook their regulation. *Pamph. L.* 1903, *p.* 457. The need of regulation in the public interest was obvious and the statute was enacted for the protection of the public savings under the inherent police power of the state.

An examination of the statute clearly evidences the intention of that legislature to strictly regulate the business of these associations and the statute contemplated throughout its provisions the central idea of co-operation, equality and mutuality upon the part of the members of the association. *Fitzgerald* v. *State Mutual Building and Loan Association,* 76 *N. J. Eq.* 137, 143.

Prior to the enactment of this statute the remedy of a withdrawing member for non-payment was not at law. *Campbell* v. *Perth Amboy Mutual Loan, &c., Association* (1901), 67 *N. J. L.* 71. Section 39 of the statute provided:

"Withdrawals shall be paid in the order in which the notices thereof are received, but not more than one-half the receipts of any one month shall be required to be used for payment of withdrawal claims, without the consent of the board of directors, until the oldest of such claims then unpaid shall have been on file for a period of six months; but in no case shall payment be postponed for a longer period than six

months from the date of such notice, and any shareholder who has given the said notice may sue for and recover the withdrawal value of his shares in any such association in any court of competent jurisdiction, if the same is not paid in six months from the date of the giving of said notice of withdrawal."

But the statutory right of a member to withdraw from membership and to receive the withdrawal value of his shares and the statutory privilege to sue for the amount if not paid within the time named in the statute, is based upon and forms a part of the general plan that each member is entitled to equal participation in the assets, and the statute does not contemplate that the privileges named shall be exercised to defeat equal participation, but that the spirit of the statute being equal participation, the paramount equity is equal participation at all times. *Fitzgerald* v. *State Mutual Building and Loan Association, supra* (at *p.* 145).

As pointed out, the statute in force when the appellant subscribed for her stock was *Pamph. L.* 1903, *ch.* 218, *p.* 471, § 39. 1 *Comp. Stat., p.* 347. The statute was, as to the question of withdrawal, identical with *Pamph. L.* 1925, *ch.* 65, *p.* 212, § 52 (Revision of 1925), the statute in force when the appellant filed her notice of withdrawal. The statute provides that withdrawals may be made at any time upon written notice required by the constitution of the association but not exceeding thirty (30) days; the withdrawals to be paid in the order received, but not more than one-half the receipts of any one month shall be used without the consent of the board of directors until the oldest unpaid claim shall have been on file six months: and, in no case is payment to be postponed beyond six months from date of notice and if so the holder may sue for and recover the withdrawal value of his shares.

*Pamph. L.* 1925, *ch.* 65, *p.* 212, § 52, was amended by the statute in question, *Pamph. L.* 1932, *ch.* 102, *p.* 175, § 52. This now provides that withdrawals shall be paid in the order of notice, but not more than one-half of the receipts of any one month, from funds received as income on investments authorized by section 26 of the statute shall be required to

be so used except as approved by the board of directors. It is to be noted that, for the first time, the term "receipts" is defined by statute. The statute further provides, however, that if in any month the above funds, plus any others made available by the directors, is not sufficient to pay all the withdrawals the right of priority of payment shall be only to the extent of $500, and if all withdrawing members have been paid in full to the extent of $500, and there is still a balance available, then the order of priority to the extent of $500 shall continue to apply until the funds are exhausted; and no withdrawals shall be paid if there are not funds sufficient to pay the matured shares on which payment has been requested thirty days after maturity. Under the statute, holders of such matured shares are given a priority over withdrawing shareholders. The statute denies a withdrawing shareholder the right to sue if the funds are applied as above stated.

The foregoing indicates that a radical change has been effected in the rights and privileges of withdrawing shareholders. The prospective effect of the statute is not challenged and rightfully not, but the appellant contends that if the statute is construed to have a retrospective effect it will affect her rights under *Pamph. L.* 1925, *ch.* 65, *p.* 212, § 52, which rights have vested, and such impairment of these rights is prohibited by article I, section 10, of the constitution of the United States, and the fourteenth amendment, section 1, thereof, and article IV, section 7, paragraph 3, of the constitution of the State of New Jersey.

In a case involving a somewhat similar statute, *Treigle* v. *Acme Homestead Association,* 297 *U. S.* 189, 197; 80 *L. Ed.* 575; 56 *Sup. Ct. Rep.* 408, Mr. Justice Roberts said:

"Though the obligations of contracts must yield to a proper exercise of the police power (*Home Building and Loan Association* v. *Blaisdell,* 290 *U. S.* 398; 78 *L. Ed.* 415; 54 *Sup. Ct. Rep.* 531, and vested rights cannot inhibit the proper exercise of police power (*Nebbia* v. *New York,* 291 *U. S.* 502; 78 *L. Ed.* 940; 54 *Sup. Ct. Rep.* 505), it must be exercised for an end which is in fact public and the means adopted must be reasonably adapted to the accomplishment of that end and must not be arbitrary or oppressive.

"As we have pointed out, the questioned sections deal only with private rights and are adapted to the legitimate end of conserving or equitably administering the assets in the interest of all the members. They deprive withdrawing members of a solvent association of existing contract rights for the benefit of those who remain. We hold the challenged provisions impair the obligation of the appellant's contract and arbitrarily deprive him of vested property rights without due process of law."

It may very well be that the statute in Louisiana was not passed "for an end which is in fact public," but the situation which faced our legislature in 1932, if allowed to run unregulated to its apparent and ultimate economic conclusion, would have affected adversely every person in this state.

It is a matter of common knowledge that a large percentage of all persons in this state over the age of twenty-one are members of building and loan associations and that assets and holdings of building and loan associations approximate, if they do not exceed, one billion dollars ($1,000,000,000).

This court must judicially notice the fact that investments of building and loan associations are regulated by statute and confined to classes of investment which are also by statute legal investments for banks, trust companies, insurance companies and trustees, particularly first mortgages on real estate located in New Jersey. The court also judicially notices the fact that the associations have foreclosed thousands of these mortgages and bought in the property at the public sale, and that the value of these mortgages runs into hundreds of millions of dollars. The court also judicially notices the enactment by the Congress of the United States of the Home Owners Loan act on June 13th, 1933, chapter 64, article 1, 48 *Stat.* 128, *tit.* 12, § 1463, *U. S. C. A.*, and it is also common knowledge that thousands of mortgagors who were in default to the associations availed themselves of the benefit of this statute.

When the legislature in 1903 gave to withdrawing shareholders the unqualified privilege of suit it did not foresee the economic collapse through which this country has labored

for the last eight years, with the consequent credit stringency, loss of employment, and collapse of price levels. It is unnecessary to cite official statistics to establish what is common knowledge throughout the length and breadth of the land. *West Coast Hotel Co.* v. *Parrish,* 81 *L. Ed.* 455, 463. In the face of this financial stringency the number of withdrawals filed by shareholders of associations accelerated at a very rapid rate. It cannot be assumed that they were an exception to what was generally happening in all saving institutions.

The liabilities of building and loan associations to other than shareholders ordinarily amounts to but a negligible percentage of its assets. *Cf. Feist* v. *Guarantee Building and Loan Association,* 118 *N. J. L.* 144. Hence under the economic conditions existing in 1932, by exercising the unfettered privilege of withdrawal and the concomitant right of suit, a rapidly increasing number of withdrawing shareholders created a condition of potential insolvency in all the building and loan associations of this state.

If the right of withdrawal was not regulated and all notices of withdrawals were reduced to judgment, these judgment liabilities, coupled with the fact that by foreclosing mortgages the building and loan associations had acquired title to thousands of unsalable properties in this state, the inevitable result would have been that most of the building and loan associations would eventually become insolvent under section 65 of the Corporation act, if we are to consider insolvency to consist of their inability to pay the rapidly gathering withdrawal demands without thereby impairing the assets available to others with like rights.

The legislatures of 1903 and 1925 were neither omniscient or prescient and events proved to the legislature of 1932 that the unfettered privilege of suit granted to withdrawing members compelled these associations to accede to the prior demands of those who made an early request for withdrawals which would completely undo the major purposes for which they were created. The 1932 legislature faced the unenviable choice of permitting conditions to continue as they were with the inevitable result being the actual insolvency of most, if

not all, of the associations, or it could regulate the rights of a withdrawing shareholder in a manner consonant with mutuality. It chose the latter and enacted the statute in question. *Pamph. L.* 1932, *ch.* 102.

The actual insolvency of these mutual corporations would have been fraught with a grave public danger. Our insolvency statute, section 65 of the Corporation act, is essentially bankrupt in character (*Block* v. *Bell Furniture Co.*, 111 *N. J. Eq.* 551, 561), and the object of the proceedings under the act is to distribute the estate of the debtor corporation (*Stockton* v. *Mechanics and Laborers Savings Bank*, 32 *N. J. Eq.* 163, 168, 169), and the matured creditors have right to payment at once. *Usher* v. *Sarco Co., &c.*, 100 *Id.* 428, 431. Building and loan associations are subject to the provisions of the Corporation act, section 4, by the Building and Loan act of 1903, as amended and revised. 1 *Cum. Supp. Comp. Stat., p.* 223; *Supp. Comp. Stat., p.* 135; *Pamph. L.* 1932, *p.* 171. If any great number of them became insolvent, ruinous liquidation necessarily would follow because withdrawing members would be entitled to be paid at once out of the assets of such insolvent associations.

Mere contemplation of such a situation forces the conclusion that there was a tremendous and grave public interest involved. As long as the privilege of suit was unabridged potential insolvency was present as to many and actual insolvency of most necessarily would follow as a matter of course.

The liquidation of the assets of these associations having a value of approximately one billion dollars would have destroyed the stability of and the market for first mortgages on real estate and other types of investments that are prescribed as legal investments by statute for banks, trust companies, insurance companies and other institutions and fiduciaries and to which classes of legal investments the funds of building and loan associations are restricted by law.

The value of real property and real estate mortgages was largely gone for the time being and liquidation could only be had on ruinous terms, but these values were susceptible of ultimate return. The result would be chaos and even under

orderly liquidation of this vast amount of assets the ultimate return of these values would be indefinitely postponed if not irreparably impaired. The state has an important interest in the maintenance of real estate values because these values form the major base upon which its tax structure and its various political subdivisions rests. The stability of the tax base over a term of years is vitally important to the state.

The structure of the tax base and the widespread membership in building and loan associations and the fact that the value of the real estate mortgages and real property owned by such associations represents a high percentage of the total value of all taxable real estate in the state, creates a situation which is peculiar to this state. It does not appear from the record or briefs in *Triegle* v. *Acme Homestead Association, supra,* that a comparable situation exists in Louisiana.

Assuming that the appellant has a vested right of contract, the obligations on contract must yield to a proper exercise of the police power of the state and vested rights cannot inhibit the proper exercise of the power. *Home Building and Loan Association* v. *Blaisdell, supra.* In *Nebbia* v. *New York, supra* (at p. 523), Mr. Justice Roberts said:

"Under our form of government the use of property and the making of contracts are normally matters of private concern. The general rule is that both shall be free from governmental interference. But neither property rights or contract rights are absolute; for government cannot exist if the citizen may, at his will, use his property right to the detriment of his fellows or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it."

This should be equally true of a contract right which derives its vitality from a statute regulating a business affected with a public interest. This state has strictly regulated building and loan associations under a well defined public policy and the state has the right so to do. *Hopkins Federal Savings and Loan Association* v. *Cleary,* 296 *U. S.* 315; 80 *L. Ed.* 251; 56 *Sup. Ct. Rep.* 235. The privilege of suit was granted to withdrawing members by the regulatory statutes of this state and it must be assumed that the legisla-

ture intended in granting the privileges of suit to withdrawing members that such a grant would be effective in carrying out the public interest affected upon which the regulation of the building and loan associations was predicated.

Experience has demonstrated that adverse economic conditions give the privilege of suit by a withdrawing member a legal force under our insolvency statutes which is absolutely destructive since the unrestricted exercise of the privilege of suit by such members was a motivating and inexorable force that eventually would have forced these associations into insolvency, forced the liquidation of their assets, with the resultant adverse effect upon vital public interests heretofore pointed out.

If such a situation had resulted from the acts of a group of citizens or corporations in the use of their property or their right of contract, can it be questioned that the legislature under the police power could disturb their vested rights of contract by a regulatory statute? That the right asserted by the appellant was granted by the legislature under a statutory enactment of previous legislatures, pursuant to the police power of the state, gives the right no greater sanctity. The fact is that unlimited use of the right is destructive of vital public interests.

The constitutional prohibition against the impairment of the obligation of contracts does not make it impossible for the state, in the exercise of its essential reserved power, to protect the vital interests of all its people. The exercise of that reserved power has been repeatedly sustained against a literalism of the contract clause which would make it destructive of the public interest by depriving the state of its prerogative of self-protection. *W. B. Worthen Co.* v. *Thomas,* 292 *U. S.* 426; 78 *L. Ed.* 1344, 1347; 54 *Sup. Ct. Rep.* 816.

Nothing that has been said here should conflict with the holdings in *Vanderbilt* v. *Brunton Piano Co.,* 111 *N. J. L.* 596, and *Home Building and Loan Association* v. *Blaisdell, supra.* The subject-matter of the contracts in those cases was not *per se* affected with a public interest. The statutes there in question had effect only upon the interests of the respective contracting parties since the contracts affected

thereby were of themselves only capable of a legal or economic force which was co-terminous with the limits of the contract.

The contract of the appellant, obviously, is not in this classification. The contract was congenitally affected with a public interest and the contract carries with it the infirmity of the subject-matter. Rights which are subject to state restriction cannot be removed from the power of the state (*Union Dry Goods Co.* v. *Georgia Public Service Corp.,* 248 *U. S.* 372; 63 *L. Ed.* 309; 39 *Sup. Ct. Rep.* 117), by the contract of the parties, nor can one legislature inhibit this power of the state to regulate or abridge the use of such contract rights when such use is destructive of vital public interests.

*Pamph. L.* 1932, *ch.* 102, *p.* 175, was enacted "for an end that was in fact public"—to prevent the actual insolvency of the building and loan associations and the resultant and disastrous effects of the liquidation of most of them upon the value of all real property in the state, and the savings of a large proportion of the citizens of the state. The abridgement of the use of the privilege of suit of withdrawing members was reasonably adapted to the accomplishment of that purpose. The only alternative was to permit the withdrawing members to sue and proceed to judgment under their statutory privilege, and that they would have done so, in sufficient numbers and amounts, to force most of the associations into insolvency is a situation that this court will judicially notice. The lack of confidence by the public in saving institutions of all kinds during that period permeated every section of this state and the country as a whole. It is likewise true in any period of economic depression. Without such abridgement of the privilege of suit of withdrawing members all other steps might have been inefficacious to meet the threat to vital public interests under similar economic conditions. Whether the situation created in the building and loan associations in this state by the economic depression is a temporary situation which will abate until the next economic depression is a question this court at this time must frankly confess it cannot answer.

For these reasons it is concluded that *Pamph. L.* 1932,

*ch.* 102, *p.* 175, is a valid exercise of the police power of the state for an end that is in fact public. The means adopted are reasonably adapted to the accomplishment of that end and are not arbitrary or oppressive but consonant with a vital public need, the purpose of the regulation of building and loan associations of this state, and the protection and conservation of their assets and the investments of the public therein.

The appellant argues that the statute also provides for a preference to holders of matured shares over withdrawing shareholders. The statute gives a priority to a matured shareholder but it only recognizes a preference which the matured shareholder had as a creditor. This court held in *Cunningham* v. *Mutual Building and Loan Association,* 72 *N. J. L.* 175, 180, that when the maturity of shares has been declared in the manner prescribed by the scheme of the constitution of the association, and that it had been recognized by the association by its officers that thereafter a holder of the matured shares became a creditor of the association, entitled to receive the money, provided the funds arising from the appropriation of one-half the receipts of the association should be sufficient for such payment.

The statute works no apparent change in the status of a matured shareholder and the preference necessarily only applies to the shareholders whose shares have been matured in the prescribed manner and who have filed the statutory notice prior to the notice of withdrawal. It leaves the status of the parties unchanged.

This results in the conclusion that the appellant's complaint did not state a cause of action and we are not concerned with the objections lodged against *Pamph. L.* 1933, *chs.* 48, 166, 258.

The judgment under review is affirmed, with costs.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, BO-DINE, DONGES, PERSKIE, DEAR, WELLS, WOLFSKEIL, RAFFERTY, JJ. 9.

*For reversal*—PARKER, LLOYD, CASE, HEHER, JJ. 4.