## VEIX *v.* SIXTH WARD BUILDING & LOAN ASSOCIATION OF NEWARK.

No. 567.   Argued March 6, 1940.—Decided April 22, 1940.

[27] *Utah Power & Light Co.* v. *United States*, 243 U. S. 389, 409.

*Messrs. Walter P. Reilly* and *James L. Handford* for appellant.

*Messrs. Fred G. Stickel, Jr.* and *Louis J. Cohen* argued the cause, and with the former *Messrs. George D. Mulligan* and *William F. Delaney* were on the brief, for appellee.

By leave of Court, briefs of *amici curiae* were filed by *Messrs. David T. Wilentz,* Attorney General of New Jersey, and *Louis J. Cohen,* Assistant Attorney General, on behalf of Louis A. Reilly, Commissioner of Banking and Insurance of that State; and by *Messrs. Horace Russell* and *David A. Bridewell,* on behalf of the U. S. Savings & Loan League,—urging affirmance.

MR. JUSTICE REED delivered the opinion of the Court.

In 1928 and 1929 appellant purchased prepaid shares of the appellee, a New Jersey building and loan association, paying the par value of $200 per share. At that

time the applicable New Jersey statutes provided that shares in such an association could be withdrawn by giving such written notice as the constitution or by-laws of the association provided, not to exceed 30 days; that withdrawals should be paid in the order in which notices were received, with not more than one-half of the receipts of any month being required to be used for payment of withdrawals, without the consent of the board of directors, until the oldest unpaid claim of withdrawal had been on file for six months; that no payment should be postponed for longer than six months from the date of notice; and that any member who had given notice could sue and recover the withdrawal value if it was not paid within six months of the notice.[1]

On April 22, 1932, these statutes were amended in four respects: (1) "total receipts" of an association, one-half of which were required to be used for the payment of withdrawals and which had not been previously defined, were defined as income on authorized investments, dues on shares of the association which were pledged with it to secure loans, and repayments from loans; (2) if in any one month the funds required to be payable for withdrawals were insufficient to pay all requested withdrawals, withdrawing members were to receive $500 each in the order of priority until the fund for withdrawals was exhausted; (3) no withdrawals were to be paid if the funds available for payment of matured shares were insufficient to pay all matured shares, the payment of which had been requested within thirty days after maturity; (4) so long as the funds of an association were applied as required by the amendment, no member who had filed his withdrawal notice should have a right to sue for the withdrawal value of his shares.[2]

---

[1] Laws of N. J., 1925, c. 65, § 52.

[2] Laws of N. J., 1932, c. 102.

In 1935 another amendment was passed providing that one-third of the "net receipts" of an association were to be payable for withdrawals, with "net receipts" defined as monies, other than borrowed monies, received by the association less operating expenses, payments on creditor obligations, payments for protecting the property of the association and reserves for any of these purposes. At the same time payment of withdrawals in the order in which notices had been received was continued but the payments were limited to $50 per member.

Minor amendments, not pertinent here, were added in 1936 and in 1937 the statutes, as they stood in 1936 with some immaterial changes, were carried into a general revision of New Jersey's statute law.

On August 17, 1932, after the passage of the 1932 amendment, appellant filed a written notice of withdrawal with respondent. In 1939, he brought this suit against respondent for the withdrawal value of his shares, claiming that, in so far as any of the amendments referred to altered the statutes in existence at the time of purchase of the shares, the amendments were unconstitutional violations of the contracts clause of Article I and the due process clause of the Fourteenth Amendment. The allegations show that the Association was solvent at the time of notice of withdrawal and has remained solvent. The trial court dismissed appellant's complaint. The Court of Errors and Appeals affirmed. 123 N. J. L. 356; 8 A. 2d 350.

The ruling was based squarely on the constitutionality of the Act of 1932. The later acts were not referred to in the opinion except by pointing out that the Act of 1932 would be found in the 1937 revision. The case is here on appeal under § 237 (a) of the Judical Code. As this section gives a review to this Court only of state statutes held valid by the highest court of a State against an attack for repugnancy to the Constitution of the United States, we

deem ourselves limited to the Act of 1932.[3]  The question
of the applicability to withdrawals of statutes on the sub-
ject which were passed subsequent to the notice of with-
drawal is not considered in this opinion.[4]

The New Jersey statutes concerning the regulation of
building and loan associations reach back many years
prior to the purchase of these shares.  Beginning in 1903
general regulatory acts were passed at intervals with sec-
tions directed at the mode of withdrawal.[5]  The form of
these statutes and the judicial notice by the Court of
Errors and Appeals in the *Bucsi* case of the importance
to the State of New Jersey of building and loan associa-
tions makes clear that in dealing in 1932 with the prob-
lem of withdrawals the legislature was faced with the
threat of wrecked associations and the consequent further
depression of real estate values throughout its area.
While the Act of 1932 now under review was not emer-
gency legislation, the dangers of unrestricted withdrawals
then became apparent.  It was passed in the public in-
terest to protect the activities of the associations for the
economic welfare of the State.  It is also plain that the
1932 act was one of a long series regulating the many
integrated phases of the building and loan business such
as formation, membership, powers, investments, reports,
liquidations, foreign associations and examinations.  We
are dealing here with financial institutions of major im-
portance to the credit system of the State.[6]

---

[3] Cf. *Bucsi* v. *Longworth B. & L. Assn.*, 119 N. J. L. 120; 194 A. 857,
where the same court dealt with statutes enacted after notice of
withdrawal.

[4] Cf. *Carpenter* v. *Wabash Ry. Co.*, *ante*, p. 23.

[5] *Bucsi* v. *Longworth B. & L. Assn.*, 119 N. J. L. 120, 124; 194
A. 857; Laws of N. J., 1903, c. 218, § 38; Laws of N. J., 1925, c. 65,
§ 49; Laws of N. J., 1932, c. 102; Revised Statutes of N. J., 1937,
17:12–49, 12–53.

[6] *Hopkins Federal Savings Assn.* v. *Cleary*, 296 U. S. 315, 328; cf.
Piquet, Building & Loan Associations in New Jersey, cc. II, VI and X.

With institutions of such importance to its economy, the State retains police powers adequate to authorize the enactment of statutes regulating the withdrawal of shares.[7] Unquestionably for the future, the provisions of the 1932 act would be effective.[8] We think they were equally effective as to shares bought prior to the enactment of the statute, notwithstanding the provisions of Article I, § 10 of the Constitution that "No State shall . . . pass any . . . Law impairing the obligation of contracts . . ." This is so because the obligation of the Association to respond to the application for withdrawal was subject to the paramount police power. Beginning with the 1903 act the State of New Jersey has laid down specifically by statute the requirements for withdrawal. The charter, by-laws and membership certificate ceased to determine withdrawal rights. (See Note 5, *supra.*) It was while statutory requirements were in effect that petitioner purchased his shares. When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic.[9]

In *Home Building & Loan Association* v. *Blaisdell* [10] this Court considered the authority retained by the State over contracts "to safeguard the vital interests of its people." The rule that all contracts are made subject to this paramount authority was there reiterated. Such authority is not limited to health, morals and safety.[11]

---

[7] *Dillingham* v. *McLaughlin*, 264 U. S. 370; *Noble State Bank* v. *Haskell*, 219 U. S. 104; *Doty* v. *Love*, 295 U. S. 64.

[8] *Stockholders* v. *Sterling*, 300 U. S. 175, and cases cited.

[9] *Rast* v. *Van Deman & Lewis*, 240 U. S. 342, 363; *Semler* v. *Dental Examiners*, 294 U. S. 608, 610.

[10] 290 U. S. 398, 434 *et seq.*

[11] *Stone* v. *Mississippi*, 101 U. S. 814, 819; *Douglas* v. *Kentucky*, 168 U. S. 488, 497–99; *Beer Co.* v. *Massachusetts*, 97 U. S. 25, 32, 33; *Mugler* v. *Kansas*, 123 U. S. 623, 664, 665; *Fertilizing Co.* v. *Hyde*

It extends to economic needs as well.[12]  Utility rate contracts give way to this power,[13] as do contractual arrangements between landlords and tenants.[14]

The cases cited in the preceding paragraph make repeated reference to the emergency existing at the time of the enactment of the questioned statutes.  Many of the enactments were temporary in character.  We are here considering a permanent piece of legislation.  So far as the contract clause is concerned, is this significant?  We think not.  "Emergency does not create [constitutional] power, emergency may furnish the occasion for the exercise of power." [15]  We think of emergencies as suddenly arising and quickly passing.  The emergency of the Depression may have caused the 1932 legislation, but the weakness in the financial system brought to light by that emergency remains.  If the legislature could enact the legislation as to withdrawals to protect the associations in that emergency, we see no reason why the new status should not continue.  When the 1932 act was passed commercial and savings banks, insurance companies and building and loan associations were suffering heavy withdrawals.  The liquid portion of their assets were being rapidly drained off by their customers, leaving the long term investments and depreciated assets as an inadequate source for pay-

Park, 97 U. S. 659, 667; Butchers' Union Co. v. Crescent City Co., 111 U. S. 746, 750; Chicago, B. & Q. R. Co. v. Nebraska, 170 U. S. 57, 70, 74; Texas & N. O. R. Co. v. Miller, 221 U. S. 408, 414; Atlantic Coast Line R. Co. v. Goldsboro, 232 U. S. 548, 558; Manigault v. Springs, 199 U. S. 473.

[12] Sproles v. Binford, 286 U. S. 374, 390; Stephenson v. Binford, 287 U. S. 251, 276; Henderson Co. v. Thompson, 300 U. S. 258, 266; Patterson v. Stanolind Co., 305 U. S. 376.

[13] Union Dry Goods Co. v. Georgia P. S. Corp., 248 U. S. 372; Midland Realty Co. v. Kansas City Power Co., 300 U. S. 109.

[14] Marcus Brown Co. v. Feldman, 256 U. S. 170; Levy Leasing Co. v. Siegel, 258 U. S. 242.

[15] Home Bldg. & L. Assn. v. Blaisdell, supra, 426.

ment of the remaining liabilities. An acceleration or a continuance of this tendency to withdraw available funds threatened a quick end to the ability of the institutions to meet even normal demands. Such threatened insolvency demands legislation for its control in the same way that liquidation after insolvency does. Such legislation may be classed as emergency in one sense but it need not be temporary.[16]

This power of the State to protect its citizens by statutory enactments affecting contract rights, without a violation of the contract clause of the Constitution, is analogous to the power often reserved to amend charters. Under this reserved power, it is held that the relations between a stockholder or certificate holder and the corporation may be varied without impairing the contract existing between the corporation and its stockholder or member.[17] The contract rights considered in *Coombes* v. *Getz*[18] arose from a contract between a third party and the corporation. And the power reserved against the corporation and its members was deemed to be ineffective against a stranger to the reservation.

Appellant relies upon *Treigle* v. *Acme Homestead Association*[19] as a determinative precedent in support of his argument that the withdrawal arrangements between the association and appellant were contractual and secure from impairment by the statutory exercise of the paramount police power of the State. In that case statutory changes as to the right of withdrawal, similar to these involved here, had been made after the purchase of the shares. The enactment in the *Treigle* case occurred after notice of

---

[16] Cf. *W. B. Worthen Co.* v. *Thomas*, 292 U. S. 426, 432.

[17] *Wright* v. *Minnesota Mutual Life Ins. Co.*, 193 U. S. 657, 663; *Polk* v. *Mutual Reserve Fund Life Assn.*, 207 U. S. 310, 325; *Stockholders* v. *Sterling*, 300 U. S. 175, 183.

[18] 285 U. S. 434.

[19] 297 U. S. 189.

withdrawal. From all the circumstances of the Louisiana building and loan situation at the time of the legislation attacked in the *Treigle* case this Court reached the factual conclusion that the withdrawal amendment to the building and loan statutes was directed merely toward a private right and not deemed in the public interest.

It is to be noted that this Court was careful to point out in the *Treigle* case [20] that where the police power is exercised "for an end which is in fact public" contracts must yield to the accomplishment of that end.[21]

Certainly the protection of building and loan associations against the catastrophe of excessive withdrawal is, today, within legislative power.

Separate consideration of the objection to the legislation under the due process and equal protection clauses of the Fourteenth Amendment seems wholly unnecessary.

*Affirmed.*

MR. JUSTICE MCREYNOLDS concurs in the result.

---

[20] *Id.,* 197.
[21] Cf. *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95, 108.