111 N.J. Super. 313 (1970)
268 A.2d 308
NEW JERSEY HIGHWAY AUTHORITY, A BODY CORPORATE AND POLITIC CREATED AND EXISTING UNDER AND BY VIRTUE OF CHAPTER 16 OF THE LAWS OF 1952, AS AMENDED AND SUPPLEMENTED; FIDELITY UNION TRUST COMPANY, A BANKING CORPORATION OF THE STATE OF NEW JERSEY, AS TRUSTEE UNDER THE GENERAL BOND RESOLUTION OF THE NEW JERSEY HIGHWAY AUTHORITY ADOPTED JULY 8, 1953, AS SUPPLEMENTED; AND FIRST NATIONAL STATE BANK OF NEW JERSEY, A NATIONAL BANKING ASSOCIATION, AS TRUSTEE UNDER THE JUNIOR BOND RESOLUTION OF THE NEW JERSEY HIGHWAY AUTHORITY ADOPTED JULY 7, 1962, AS SUPPLEMENTED, PLAINTIFFS,
v.
ARTHUR J. SILLS, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided July 29, 1970.
*314 Mr. Theodore W. Geiser for plaintiff New Jersey Highway Authority (Messrs. Pindar, McElroy, Connell, Foley & Geiser, attorneys).
Mr. Dickinson R. Debevoise for plaintiff Fidelity Union Trust Company, trustee (Messrs. Riker, Danzig, Scherer & Brown, attorneys).
Mr. John J. McDonough for plaintiff First National State Bank of New Jersey, trustee.
Mr. Philip S. Carchman, Deputy Attorney General, for defendant.
Mr. J. Leonard Hornstein for Intervenors-Defendants 78th Division (Training) United States Army Reserve and National Guard Association of New Jersey (Messrs. Hornstein & Hornstein, attorneys).
HERBERT, J.S.C.
This supplements an earlier opinion dated March 25, 1970 which is reported in 109 N.J. Super. 424 (Ch. Div. 1970). After that opinion was published, but before any judgment was entered, application was made by 78th Division (Training) United States Army Reserve and by Natonal Guard Association of New Jersey to intervene for the purpose of defending against plaintiffs' contentions that Chapters 352 and 414 of the Laws of 1968 are unconstitutional. Over objections intervention was allowed, the *315 order of intervention being dated April 16, 1970 and providing for a final hearing on the merits on May 7, 1970.
My recollection is that nothing took place on May 7th except that an adjournment to a later date was arranged. Either on May 7th or on a later date the attorney for the intervenors as well as counsel for the other parties agreed that there was no need to hear the testimony of any witnesses. It was agreed further that written material on behalf of the intervenors would be served and filed. That has now been done in the form of letters dated June 24, 1970 and July 22, 1970. Both of these are, in effect, informal briefs which develop arguments and cite authorities in support of intervenors' position. Although the letter of June 24th mentioned a failure to furnish information about total Garden State Parkway revenues for 1969, total bond service costs for 1969 and the amount of alleged loss of tolls in the same year resulting from free passage by National Guard and Army Reserve personnel, such information was furnished promptly thereafter. It is now my understanding that I have before me everything that any party desires to submit.
Total Parkway revenues for 1969 were: gross, $46,942,171.00; net, $33,312,885.00. Total bond service costs for that year were $17,816,740.00. As to toll-free passage, 99,546 tickets or passes were used by National Guardsmen and Army Reservists from February to December of 1969 indicating, at a value of 25¢ each, approximately $25,000.00 of revenue lost during that period of eleven months. In a full year, free passage at this rate of use would result in loss of approximately $27,300.00 if the likely assumption is made that no appreciable number of guardsmen and reservists would cease to drive on the Parkway because of a requirement that they pay for passage.
There is no need, however, to determine with accuracy, or even estimate with great care, the diminution of revenue which has resulted, and would result in the future, from use of the toll-free privileges provided by the two statutes in question. Whatever the precise figures, the diminution is *316 certainly very small when contrasted with total revenues and with the margin of about $15,500,000.00 left from net revenues in 1969 after providing for bond service costs. I agree with one basic premise of intervenor's argument; I cannot foresee any possibility that toll-free passage by guardsmen and reservists as provided in the two statutes will ever cause a default on bonds now outstanding or will ever create a situation which might threaten a default. However, the possibility of an early call is part of a bondholder's contract. The difference between having and not having $27,000 a year will not cause a default but when viewed as loss of the means to retire bonds each year, by call or open-market purchase, the impact of the statutes becomes more important.
Intervenors contend that the relatively small diminution in tolls caused by free trips on the Parkway as provided for in Chapters 352 and 414 of the Laws of 1968 does not make those statutes unconstitutional. The case on which they principally rely is City of El Paso v. Simmons, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965) rehearing denied 380 U.S. 926, 85 S.Ct. 879, 13 L.Ed.2d 813 (1965). That case dealt with an application of the contract clause of the Federal Constitution. In my earlier opinion, without having had the benefit of intervenors' arguments, I ruled that the two statutes in question were in conflict wth the contract clauses of the Federal and New Jersey Constitutions.
In addition to City of El Paso these cases have been cited by intervenors: State v. Sutton, 83 N.J.L. 46 (Sup. Ct. 1913), affd. 87 N.J.L. 192 (E. & A. 1915); Public Service Railway Co. v. Board of Public Utility Commissioners, 89 N.J.L. 24 (Sup. Ct. 1916); O'Gorman & Young v. Phoenix Assurance Co., 105 N.J.L. 642 (E. & A. 1929); City of Newark v. Public Service Co-Ordinated Transport, 9 Misc. 722 (Sup. Ct. 1931), affd. 109 N.J.L. 270 (E. & A. 1932); Hourigan v. North Bergen, 113 N.J.L. 143 (E. & A. 1934); State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504 (E. & A. 1934); In re North Jersey Title Insurance *317 Co., 120 N.J. Eq. 148 (Ch. Div. 1936); Bucsi v. Longworth Building & Loan Assn., 119 N.J.L. 120 (E. & A. 1937); Faitoute Iron & Steel Co. v. City of Asbury Park, 127 N.J.L. 239 (E. & A. 1941); Veix v. Sixth Ward Building & Loan Assoc. of Newark, 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940); Jamouneau v. Harner, 16 N.J. 500 (1954), and Ohlson v. Phillips, 304 F. Supp. 1152 (D.C. 1969). A number of them, though dealing with questions of constitutionality, did not in any way involve the subject of contract impairment; and in that class I place State v. Sutton, Public Service Railway Co., City of Newark v. Public Service, State Board of Milk Control and Jamouneau, supra. Some, if not all of the others in the list above, as well as City of El Paso, supra show that in some situations legislation which represents a valid exercise of police power has been held to be constitutional in spite of resulting impairment of contract obligations.
In City of El Paso v. Simmons, supra, predecessors of Simmons had contracted in 1910 to buy school lands from the State of Texas. The law at the time provided that in the event of any declaration of forfeiture for non-payment of interest the purchasers or their assignees might on written request have their claims reinstated at any time by paying into the state treasury the full amount of interest due on the claim up to the date of reinstatement. In 1941 the statute was amended to provide that within five years after a declaration of forfeiture the right to reinstate might be exercised, but not thereafter. A forfeiture was declared by the State in 1947, followed more than five years later by an application for reinstatement on the part of Simmons, who had taken quitclaim deeds to the lands. The application was rejected as too late and in 1955 Texas undertook to sell to the City of El Paso. The Supreme Court, reversing the Court of Appeals which in turn had reversed the District Court, held the 1941 legislation, with its five-year limit on the right to reinstate, constitutional and that the City owned the property and Simmons had no claim to it.
*318 In his opinion for the majority Mr. Justice White said:
We do not pause to consider further whether the Court of Appeals correctly ascertained the Texas law at the time these contracts were made, or to chart again the dividing line under federal law between "remedy" and "obligation," or to determine the extent to which this line is controlled by state court decisions, decisions often rendered in contexts not involving Contract Clause considerations. For it is not every modification of a contractual promise that impairs the obligation of contract under federal law, no more than it is every alteration of existing remedies that violates the Contract Clause. Stephenson v. Binford, 287 U.S. 251, 276, 53 S.Ct. 181, 188; 77 L.Ed. 288; Stone v. Mississippi, 101 U.S. 814, 819, 25 L.Ed. 1079; Manigault v. Springs, 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274. Assuming the provision for reinstatement after default to be part of the State's obligation, we do not think its modification by a five-year statute of repose contravenes the Contract Clause.
The decisions "put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula," as Chief Justice Hughes said in Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398, 428, 54 S.Ct. 231, 236. The Blaisdell opinion, which amounted to a comprehensive restatement of the principles underlying the application of the Contract Clause, makes it quite clear that "[n]ot only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end `has the result of modifying or abrogating contracts already in effect.' Stephenson v. Binford, 287 U.S. 251, 276 [53 S.Ct. 181, 189], 77 L.Ed. 288, 301. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. * * * This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court." 290 U.S., at 434-435, 54 S.Ct., at 238-239, 78 L.Ed. at 426, 427 [379 U.S. 506 et seq., 85 S.Ct. 582]
And at the conclusion of his discussion of general principles he said at p. 509, 85 S.Ct. at page 584. "But we think the objects of the Texas statute make abundantly clear that it impairs no protected right under the Contract Clause."
What follows is an entire section of the opinion devoted to a summary of Texas policy and practices with regard to public lands, the difficulties created for the state and its *319 citizens by thousands of outstanding and delinquent land contracts and the widespread and urgent need for corrective legislation.
Our New Jersey cases appear to be consistent with the general principles stated in City of El Paso, supra. Hourigan v. North Bergen Township, supra, may be mentioned particularly. The legislation there in question had been passed for the relief of municipalities which, during the great depression, were unable to collect taxes and get funds with which to meet their obligations. It was held to be a valid exercise of the police power and hence not an unconstitutional conflict with the contract clauses of federal and state constitutions. During the course of its opinion the Court said:
It is a well established doctrine that the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people, and is paramount to any rights under contracts between individuals. [113 N.J.L. at 149]
I have no doubt that if the statutes here in question are allowed to stand, they will impair the obligation of the contract with bondholders and their trustees. The position of every bondholder will have deteriorated to some extent. For a strong statement that the amount and extent of impairment is immaterial see 16 Am. Jur.2d "Constitutional Law" § 446 (1964), where many authorities are listed. The question appears to narrow down to this: Are the statutes such a valid exercise of the state's police power as to represent a permissible impairment?
The difficulty of defining the term "police power" hardly calls for comment. Many of the attempts at definition are mentioned in 16 Am. Jur.2d, "Constitutional Law" § 261 and 262 (1964), and footnotes. However, I think it unnecessary *320 to consider whether Chapters 352 and 414 of the Laws of 1968 represent an exercise of the State's police power. Assuming that they do, they are unlike the emergency legislation of Hourigan, Faitoute Iron & Steel Co. and Veix, the statutes dealt with in all three of those cases having been passed to relieve general and severe problems of the depression years. Chapters 352 and 414 have for their primary objective the conferring of personal benefits upon Guardsmen and Army Reservists. They are not an attempt to solve an emergency problem and are not addressed to any problem of state-wide importance as was the Texas legislation considered in City of El Paso. The State, of course, has a legitimate interest in having members of the National Guard and Army Reserve attend training sessions as well as an interest in persuading new members to join. Perhaps some small measure of the persuasion might be the prospect of toll-free passage to and from training sessions.
Chapters 352 and 414 of the Laws of 1968 are relatively unimportant pieces of legislation. Free passage on New Jersey toll roads for Guardsmen and Army Reservists who are going to or coming home from training sessions is not vital to them, to the plaintiffs or to anyone else. Mr. Justice Black, dissenting in City of El Paso, supra chided his colleagues of the majority with "balancing away the plain guarantee of U.S. Const. Art. I, § 10, that `No State shall * * * pass any * * * Law impairing the Obligation of Contracts. * * *'" To do that "balancing" the majority, as noted above, pointed out the great importance to Texas of the legislation which had cut down to five years the previously unlimited right to reinstate defaulted contracts to purchase state lands. In my judgment City of El Paso will not support a holding that ordinary and relatively unimportant legislation can impair the obligation of contracts without conflicting with the constitutional prohibition against impairment, even though the degree is small or even slight. I conclude that the two statutes in question are not such products of the legislative power of the State of New Jersey *321 that they can stand in the face of the constitutional prohibitions against impairment of contract obligations; and that they are unconstitutional.
In the opinion (109 N.J. Super. 424) to which this is a supplement First National Bank of Boston v. Maine Turnpike Authority, 153 Me. 131, 136 A.2d 699 (Sup. Jud. Ct. 1957) was cited and relied upon as an authority under the contract clause. Intervenors now argue that the holding of the Maine court was based primarily on the police power of the state to require public utility companies to make and pay for necessary relocations of their lines. I have re-examined the case and have not changed my view that it is a pertinent authority which supports the conclusion that Chapters 352 and 414 of the Laws of 1968 are unconstitutional. The action was one for a declaratory judgment. The earlier portion of the opinion does consider, among other things, the police power of the state over public utility installations, but the court also carefully dealt with (136 A.2d 718, et seq.) the contract impairment problem and held the legislation before it to be unconstitutional under the contract clauses of both the Federal and Maine Constitutions. Intervenors point out that the amount of money involved, estimated at a sum not in excess of $300,000 was described by the Maine court as "very ponderable." However, the expense of following the statute would have ended for the Maine Turnpike Authority upon completion of the Portland-Augusta extension and would not have affected the financial affairs of the Turnpike year after year as a legislative imposition of toll-free travel would have done.
Intervenors have also called attention to other states which have statutes like Chapters 352 and 414. Those states are Florida, Kentucky, Maryland and New York. It is conceded that, except in Kentucky, the statutory direction for toll-free passage was passed prior to or at the same time as the creation of the particular state's toll roads. The Kentucky statute directing that no tolls be charged was adopted in 1954, approximately four years after the statute authorizing *322 the construction of the Kentucky Turnpike. However, intervenors inform me that no case has been found in which the Kentucky legislation on tolls has been ruled upon by any court. I see nothing significant for us, and certainly not conclusive, in what these other states have done.
As was said at the close of the prior opinion in this case: Chapters 352 and 414 being unconstitutional, judgment will be entered instructing plaintiff trustees as well as plaintiff Highway Authority that the provisions of the Authority's bond resolutions are to be enforced and complied with as though those chapters had never been passed by the Legislature; and the judgment shall include a specific order to the Highway Authority to charge tolls without regard to the terms of the two statutes so that it may perform its contract obligations to its bondholders and to their trustees and thereby do its part in responding to the enforcement instructions to the trustees which will be included in the judgment.