Cooke, J. (dissenting).
I dissent and vote to reverse.
The majority’s construction of the terms of the Financial Emergency Act (L 1975, ch 868, § 2, subd 10, as amd by L 1975, ch 870, § 11) elevates form over substance. The act suspends wage increases "pursuant to collective bargaining agreements or other analogous contracts.” The judgment of Special Term confirming the impasse panel’s award did not create the police officers’ right to the wage increases. The *212 right was obtained "pursuant to collective bargaining” to which the parties were required to submit; the judgment was merely an attempt to enforce that which had been obtained pursuant to the collective bargaining. It is as simple as that.
The majority asserts that since the statute describes "particular situations” to which it applies, "an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded” (quoting from McKinney’s Cons Laws of NY, Book 1, Statutes, § 240).* This analysis misapplies the quoted principle and overlooks various other dominant principles of statutory construction.
First of all, the statute speaks to "Increases in salary or wages * * * pursuant to collective bargaining agreements or other analogous contracts.” The judgment obtained was not separate and apart from the collective bargaining agreement on which it was based. A judgment does not create new rights but defines and determines what rights already exist. That the terms "agreements or other analogous contracts” embrace judgments obtained for the enforcement thereof has been determined previously and effectively by this very court in Jacobs v Newman (254 NY 298). There, at the close of testimony, the complaint was dismissed on the ground that under the defendant’s contract, he was obligated to pay to the plaintiff only one half the payments made by plaintiff to Kelsey "pursuant to the said Kelsey contract,” and that the plaintiff defaulted under that contract and subsequent payments were made not "pursuant to that contract” but in settlement of a judgment obtained against the plaintiff (p 302). This court held that dismissal was error and that it rested upon "too narrow a construction of the defendant’s obligation” (p 302). It was held at pages 303-304: "Here the plaintiff’s previous default under the contract with Kelsey had resulted in Kelsey declaring the full purchase price due and bringing an action to recover that price. That action did not terminate the contract of sale. On the contrary, it was based upon the *213 existence of the contract and was brought to enforce the obligation of the contract. (D’Aprile v. Turner-Looker Co., 239 N. Y. 427.) Title to the stock still remained in the plaintiff or plaintiff’s assignee, and the stock was still held as security for the purchase price. Even though in a sense the original obligation of plaintiff to Kelsey was merged in the judgment, the judgment does not obliterate the essential features of the obligation on which it is rendered. ’ (Murphy v. Manning, 134 Mass. 488.)” (Emphasis added.) Here, too, the judgment did not terminate the collective bargaining agreement and was merely a part of the enforcement of the obligation of that agreement.
A review of these other principles manifests the technical nature of the majority’s analysis. In construing a statute, the " 'intent of the Legislature in enacting legislation is the primary object to be found’ ” and " '[wjhenever such intention is apparent it must be followed in construing the statute’ ” (Matter of Astman v Kelly, 2 NY2d 567, 572; see McKinney’s Cons Laws of NY, Book 1, Statutes, § 92, subd a). " 'It is a familiar legal maxim that "he who considers merely the letter of an instrument goes but skin deep into its meaning”, and all statutes are to be construed according to their meaning, not according to the letter’ ” (Matter of River Brand Rice Mills v Latrobe Brewing Co., 305 NY 36, 43-44). Here, it is clear that the Legislature intended to suspend wage increases during a period of financial emergency. In using the term "collective bargaining agreements” in the act, it must be assumed that the Legislature knew that judgments might be obtained to enforce such agreements. It is totally unreasonable to assume that by omitting the term judgments from the act, the Legislature intended to allow a particular group of employees to overcome the effect of the act by obtaining a judgment. By this reasoning, if the act had used the term "judgment”, but failed to use the term "award”, a wage increase pursuant to the award of an impasse panel, would not be subject to the wage freeze.
The fact that other portions of the act refer specifically to judgments (Local Finance Law, §§ 85.10, 85.30; L 1975, ch 868, § 19, as repealed and superseded by L 1975, ch 870, §§ 24, 26, respectively), casts little light on the intention of the Legislature with respect to the wage freeze, since those provisions of the act were designed specifically to deal with "claims” against the municipality.
*214 The majority states that the act does not apply in this case because "the wage increase did not 'take effect’ by virtue of a collective bargaining agreement” (p 208). This misreads the act, which in relevant part provides: "Increases in salary or wages of employees of the city * * * which have taken effect since June thirtieth, nineteen hundred seventy-five or which will take effect after that date pursuant to collective bargaining agreements or other analogous contracts, now in existence or hereinafter entered into * * * are hereby suspended.” (Emphasis added.) The words "taken effect” and "take effect” modify the reference to June 30 or dates thereafter and do not modify the words "pursuant to collective bargaining agreements.” The Legislature intended to limit the act to wage increases that "take effect” after a certain date and that is why the drafters inserted the words "take effect”; the words were not inserted to limit the act to wage increases that "take effect” pursuant to collective bargaining agreements as contrasted with judgments. Moreover, even if one were to accept the majority’s interpretation, it is still no more than a strained attempt to say that, because a judgment was obtained, the wage increase was not pursuant to collective bargaining.
The majority further notes that since "the statute in question was adopted some two months after the July 1 judgment requiring that the city pay the salary increase * * * we must assume the Legislature was well aware of this fact when the statute was passed” (p 209). This does not mean that the Legislature intended to omit judgments from the act. One may just as easily assume not only, as the majority implies, that the Legislature was aware of the judgment, but also that it was rendered on July 1, and, therefore, that the act was made applicable to wage increases "which have taken effect since June thirtieth” specifically to cover this wage increase.
It is a recognized principle that "statutes promoting the public good are liberally construed” (McKinney’s Cons Laws of NY, Book 1, Statutes, § 341; see Englishbe v Helmuth, 3 NY 294; People v Dennis, 206 Misc 402 [Munder, J.]). There can be no doubt that the purpose of the Financial Emergency Act was to protect the public from the chaos that would result from the inability of the city to continue to provide essential services (see L 1975, ch 868, § 1). Yet, under the guise of literal interpretation of the act, the majority imposes a technical construction of its terms which defeats that purpose.
*215 The fundamental constitutional principle of the separation of powers among the three departments of government is included by implication in the pattern of government adopted by the State of New York (Matter of Gottlieb v Duryea, 38 AD2d 634, affd 30 NY2d 807, cert den 409 US 1008). Under this principle of separation of powers, it is fundamental that courts may not without warrant restrict the scope of legislation in a manner that would thwart the legislative policy or engraft exceptions where none exist (see Matter of People [Lawyers Westchester Mtge. & Tit. Co.], 288 NY 40, 50; 9 NY Jur, Constitutional Law, § 118).
There is no question but that the act applies to judgments arising out of the negotiating contracts and, therefore, we should reach the PBA’s contentions as to the act’s validity.
It is asserted that the judgment obtained at Special Term may not be impaired by the subsequent passage of the act suspending wage increases. In this respect, it is sufficient to note that where a statute "is enacted after judgment and pending appeal, the appellate court may dispose of the case in accordance with the law as changed by the statute” (Robinson v Robins Dry Dock & Repair Co., 238 NY 271, 281; cf. Matter of Demisay, Inc. v Petito, 31 NY2d 896; see Veix v Sixth Ward Assn., 310 US 32; United States v Schooner Peggy, 1 Cranch [5 US] 103, 110; see, generally, 1 Antieau, Modern Constitutional Law, § 3:33, p 254).
The next and principal contention of the PBA is that the act contravenes the Federal contract clause (US Const, art I, § 10). In this respect, the case of Flushing Nat. Bank v Municipal Assistance Corp. for City of N. Y. (40 NY2d 731, 740) has no application here, since there the majority stated: "The Federal issues are not reached and therefore cases construing Federal constitutional provisions, especially the impairment clause, cast little light on the State constitutional issues in this case.” Here, there are no State constitutional provisions that in any sense are determinative. Although the respondents contend that the wage freeze violates the prohibition of impairment of pension benefits in the State Constitution (NY Const, art V, § 7), it is sufficient to note that existing benefits are not impaired by the act; the only effect of the act is to prevent increased benefits that may be derived from a wage increase (cf. Kleinfeldt v New York City Employees’ Retirement System, 36 NY2d 95). Equally without merit is the PBA’s contention that the creation of the Emergency Finan *216 cial Control Board pursuant to the act is a violation of the "Home Rule” guarantee (art IX, § 1) of the State Constitution (see Matter of Toia v Regan, 40 NY2d 837, 838; cf. Wein v City of New York, 36 NY2d 610, 619-620)
Turning then to the question of whether the Federal contract clause prohibits the wage freeze, the principles are well established. As one noted authority has stated: "When a state permits within its jurisdiction certain contracts, or enters into contracts itself with private parties, it always reserves the right as a sovereign to make whatever changes are necessary to protect the public health, safety, morality or general welfare.” (1 Antieau, Modern Constitutional Law, § 3:30, p 250.)
This principle was derived from the ruling of the United States Supreme Court in Home Bldg. & Loan Assn, v Blaisdell (290 US 398) wherein it was stated (pp 434-435): "Not only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end ’has the result of modifying or abrogating contracts already in effect. ’ Stephenson v. Binford, 287 U. S. 251, 276. Not only are existing laws read into contracts in order to fx obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worthwile,—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.” (Emphasis added.) Indeed, there can be no doubt of the broad application , of these principles for: "[t]he economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts” (290 US, at p 437).
Despite the broad language of the court in Blaisdell, it is argued that the exercise of the police power is limited to a temporary impairment and that, thus, depending on the degree of impairment, in some instances the State may not exercise the police power to provide essential services. This same argument was raised in Blaisdell and there the court *217 responded: "The argument is pressed that in the cases we have cited the obligation of contracts was affected only incidentally. This argument proceeds upon a misconception. The question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end” (290 US, at p 438). Here, the legislation is most assuredly addressed to a legitimate end. The Legislature expressly found that "a financial emergency * * * exists in the city of New York. The city is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders * * * These events [nonpayments to unpaid employees, vendors and suppliers, recipients of public assistance and city obligations] would effectively force the city to stop operating as a viable governmental entity and create a clear and present danger to the health, safety and welfare of its inhabitants * * * If the city were unable, because of the lack of funds, to function in its normal manner, the economy of the state would, therefore, be drastically harmed * * * This situation is a disaster and creates a state of emergency” (L 1975, ch 868, § 1).
The PBA argues, however, that the legislative measures here taken are not reasonable and appropriate. This argument is totally without merit. It is indeed reasonable and appropriate to freeze wages and to take various other measures to reduce expenditures in order to provide funds for essential services—such as hospitals, schools, fire protection, sanitation and indeed, even a continuation of police protection itself. The need for the State to act for the general welfare of its people was definitively expressed in East N. Y. Bank v Hahn (326 US 230, 232-233) in this manner:
"The Blaisdell case and decisions rendered since (e.g., Honeyman v. Jacobs, 306 U. S. 539; Veix v. Sixth Ward Assn., 310 U. S. 32; Gelfert v. National City Bank, 313 U. S. 221; Faitoute Co. v. Asbury Park, 316 U. S. 502), yield this governing constitutional principle: when a widely diffused public interest has become enmeshed in a network of multitudinous private arrangements, the authority of the State 'to safeguard the vital interests of its people,’ 290 U. S. at 434, is not to be gainsaid by abstracting one such arrangement from its public context and treating it as though it were an isolated private contract constitutionally immune from impairment.
*218 "The formal mode of reasoning by means of which this 'protective power of the State,’ 290 U. S. at 440, is acknowledged is of little moment. It may be treated as an implied condition of every contract and, as such, as much part of the contract as though it were written into it, whereby the State’s exercise of its power enforces, and does not impair, a contract. A more candid statement is to recognize, as was said in Manigault v. Springs, supra, that the power 'which in its various ramiñcations is known as the police power, is an exercise of the sovereign right of the Government to protect the * * * general welfare of the people, and is paramount to any rights under contracts between individuals. ’ 199 U. S. at 480. Once we are in this domain of the reserve power of a State we must respect the 'wide discretion on the part of the legislature in determining what is and what is not necessary.’ Ibid. So far as the constitutional issue is concerned, 'the power of the State when otherwise justified,’ Marcus Brown Co. v. Feldman, 256 U. S. 170, 198, is not diminished because a private contract may be affected.” (Emphasis added.)
The cases of Worthen Co. v Thomas (292 US 426) and Worthen Co. v Kavanaugh (295 US 56), relied on by the PBA, are not determinative of whether a wage freeze is reasonable and appropriate to the city’s efforts at continuing essential services. It must be stressed that the standard to be applied is not whether the measures taken by the Legislature are sufficiently temporary but, rather, whether such measures are reasonable and appropriate (see Home Bldg. & Loan Assn, v Blaisdell, 290 US 398, 438, supra). Moreover, any notion that only very limited temporary measures are permissible under Blaisdell has been disavowed subsequent to the cases relied on by the PBA (see Veix v Sixth Ward Assn., 310 US 32, 39-41, supra).
The narrow ground upon which Judge Jasen resolves the constitutional issue is not in line with prevailing cases as they have developed. The key to this case is the relationship between the State and all its people and not the relationship between the State and public employees. Under Blaisdell, if the legislation is reasonable and appropriate, it is permissible even if it interferes with the rights of private parties, as well as public employees.
As stated in Blaisdell (290 US, pp 447-448), whether the legislation is wise or unwise as a matter of policy is a question *219 with which we are not concerned. That is not the court’s function.
Without question, the cases are legion, the principles well established, and the wage freeze provision of the act should be declared constitutional.
Accordingly, there should be a reversal.
Chief Judge Breitel and Judges Gabrielli and Jones concur with Judge Wachtler; Judges Jasen and Cooke dissent and vote to reverse in separate dissenting opinions; Judge Fuchsberg taking no part.
Order affirmed, with costs. Question certified answered in the affirmative.

 This section cited by the majority, at page 414, itself states: "The maxim expressio unius est exclusio alterius is not, however, an ironbound rule of law excluding in all cases from the operation of a statute those things which are not enumerated therein. It is merely an aid to be utilized in ascertaining the meaning of a statute when its language is ambiguous, and should be applied to accomplish the legislative intention, not to defeat it. If the language of a statute indicates that other things than those mentioned are intended to be included within its operation, the maxim will not necessarily require their exclusion, but in such case the intention to the contrary must be discernable from the context of the act itself.” (Emphasis added.)