**In re David Michael GARRISON, Debtor.**

**Bankruptcy No. 87–02508–W.**

United States Bankruptcy Court, N.D. Oklahoma.

Dec. 12, 1989.

Mark A. Craige, Herrold, Gregg & Herrold, Inc., Tulsa, Okl., for debtor.

Fred W. Woodson, James A. Hogue, Sr., Hogue & Turkel, Inc., Tulsa, Okl., for trustee.

## ORDER GRANTING TRUSTEE'S MOTION FOR DISALLOWANCE OF DEBTOR'S CLAIM OF EXEMPTIONS

MICKEY DAN WILSON, Bankruptcy Judge.

On February 3, 1988, there came on for hearing the Trustee's motion for disallowance of Debtor's claim of exemption of his interest in an individual retirement account; after hearing, the matter was taken under advisement. Facts are not in dispute. Upon consideration of statements and arguments of counsel, and of the record herein, the Court, pursuant to Bankruptcy Rules 7052 and 9014, finds, concludes and orders as follows.

### FINDINGS OF FACT

On October 29, 1987, the Trustee filed his "... Objection to List of Property Claimed as Exempt and Motion for Disallowance." On November 10, 1987, Debtor filed his "Objection to Trustee's Objection to List of Property Claimed as Exempt and Objection to Motion for Disallowance." On January 15, 1988, the Trustee and Debtor filed their respective briefs herein. At hearing on February 3, 1988, counsel recited certain statements of fact into the record. Unless otherwise noted, the findings below are based upon statements of counsel in their briefs and in open court, and on the record on file with the Bankruptcy Clerk in this case.

On April 19, 1983, David Michael Garrison ("Garrison", "Debtor") established his individual retirement account ("IRA") with State Farm Life Insurance, IRA account number LF06638237, making an initial deposit of $2,250. Further deposits were made into the IRA, but none on or after April 16, 1987. The present balance in the IRA is $8,500.

The Court has not been informed of the specific provisions of this IRA, and therefore presumes that this IRA is like other IRAs in that it is established by and with funds of the account owner (Garrison) and allows the account owner (Garrison) to terminate the account and withdraw the funds at any time upon payment of a penalty of approximately 10% of the account balance to the Internal Revenue Service.

Thereafter, Garrison incurred debts which remain unpaid, as follows: a loan of $91,796.86 incurred in March, 1986, secured by a mortgage on Garrison's residence valued at $130,000.00, see Schedule A-2; and unsecured debts totaling $46,691.51, incurred as follows—$250.00 debt to Capricorn Appraisals in January, 1987; $3,176.01 debt to David W. Kvach for "loan" and $2,500.00 debt to Lapetco, Inc., for "operating expenses" in March, 1987, and the remainder to eight listed creditors, largely as a result of Garrison's divorce, in May and August of 1987.

Before April 16, 1987, this IRA could have been claimed exempt only under 60 O.S.1981 §§ 175.25 and/or 326–328.

On April 16, 1987, Oklahoma Governor Henry Bellmon signed into law House Bill 1331 amending 31 O.S.1981 § 1 to add a new subsection (A) ... 20, providing for exemption of tax-qualified retirement plan interests and specifically mentioning "... individual retirement accounts ..." An emergency clause caused the law to become effective immediately, i.e. on April 16, 1987.

On September 11, 1987, Garrison filed his voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court.

Fred W. Woodson was appointed and continues to serve as Trustee ("the Trustee") of Mr. Garrison's Chapter 7 estate in bankruptcy.

## CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), 11 U.S.C. § 522(b), (*l*).

Debtor does not dispute the inclusion of this IRA in his Chapter 7 bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1), (c)(2). The issue is whether this account or its proceeds, even if first brought into the estate under 11 U.S.C. § 541, may yet be taken back out of the estate pursuant to Oklahoma exemptions made applicable herein by 11 U.S.C. § 522(b), 31 O.S.A. (1989 Supp.) § 1(B).

In *In re Goldberg*, 59 B.R. 201 (B.C., N.D.Okla.1986), this Court held that 60 O.S.1981 §§ 326–328 did not exempt a tax-qualified retirement plan which was also a self-settled, revocable spendthrift trust, as a matter of probable legislative intent and public policy; the Court observed that it was "unlikely" that the Oklahoma Legislature intended 60 O.S.1981 §§ 326–328 to operate in any manner contrary to "the strong public policy that will prevent any person from placing his property in a revocable trust for his own benefit which would be exempt from creditors," *In re Goldberg*, 59 B.R. p. 206. Debtor concedes that his IRA is the equivalent of a self-settled, revocable spendthrift trust; but argues that it is nevertheless exempt under new 31 C.S.A. (1989 Supp.) § 1(A)(20), which provides as follows:

> Subject to the Uniform Fraudulent Transfer Act, Section 112 et seq. of Title 24 of the Oklahoma Statutes, any interest in a retirement plan or arrangement qualified for tax exemption purposes under present or future Acts of Congress; provided, such interest shall be exempt only to the extent that contributions by or on behalf of a participant were not subject to federal income taxation to such participant at the time of such contributions, plus earnings and other additions thereon; provided further, any transfer or rollover contribution between retirement plans or arrangements which avoids current federal income taxation shall not be deemed a transfer which is fraudulent as to a creditor under the Uniform Fraudulent Transfer Act. "Retirement plan or arrangement qualified for tax exemption purposes" shall include without limitation, trusts, custodial accounts, insurance, annuity contracts and other properties and rights constituting a part thereof. By way of example and not by limitation, retirement plans or arrangements qualified for tax exemption purposes permitted under present Acts of Congress include defined contribution plans and defined benefit plans as defined under the Internal Revenue Code ("IRC"), individual retirement accounts, individual retirement annuities, simplified employee pension plans, Keogh plans, IRC Section 403(a) annuity plans, IRC Section 403(b) annuities and eligible state deferred compensation plans governed under IRC Section 457. This provision shall be in addition to and not a limitation of any other provision of the Oklahoma Statutes which grants an exemption from attachment or execution and every other species of forced sale for the payment of debts. This provision shall be effective for retirement plans and arrangements in existence on, or created after the effective date of this act . . .

According to Debtor, this statute legislatively overrules *In re Goldberg*, supra, repeals or modifies 60 O.S.1981 §§ 326–328 by implication, and deliberately does the "unlikely"—namely, exempts, without qualification, even those retirement plans that would violate public policy as an abusive sheltering of assets from creditors. The Trustee does not offer any different interpretation of 31 O.S., supra, § 1(A)(20), nor attempt any reconciliation of that statute with 60 O.S.1981 §§ 175.25, 326–328. The Trustee does propose that 31 O.S., supra, § 1(A)(20), as interpreted by Debtor, is unconstitutional as applied to enforcement of contractual debts incurred before enactment of the statute, as an impairment of the obligation of contracts by the State of Oklahoma, forbidden by Article 1 Sec. 10

of the United States Constitution and by Article II, Sec. 15 of the Oklahoma Constitution. That constitutional question is the sole issue presented to this Court by the parties herein.

The Trustee's own rights and powers as a levying creditor arise as of the date when the bankruptcy petition is filed. But Chapter 7 bankruptcy is, in one sense, a sort of super-execution by a Trustee acting on behalf of all pre-petition creditors at once. Three of the unsecured creditors represented herein by the Trustee, who would share in any distribution of liquidated nonexempt assets, extended credit to Debtor in what appear to be voluntary contractual transactions before enactment of new 31 O.S., supra, § 1(A)(20) on April 16, 1987. As to these three creditors, at least, the new 31 O.S., supra, § 1(A)(20) would operate retroactively and might be unconstitutional. As representative of these three creditors, at least, the Trustee has standing to litigate this matter.

The issue arises under a provision of the United States Constitution which forbids impairment of the obligation of contracts *by States*, and a parallel provision of the Oklahoma Constitution. There is no such restriction on the Federal government. Bankruptcy occurs in Federal courts and is governed generally by Federal law; State exemptions are effective in bankruptcy only because the power to make them so is delegated by Congress to State legislatures—in effect, Federal law adopts State exemptions for Federal purposes. However, nothing suggests that Congress, by adopting State exemptions, meant to adopt and give effect to State exemptions which would otherwise be unconstitutional and ineffective. Congress intended to bring Federal bankruptcy exemptions into line with exemptions in each State's own execution proceedings; the revival in Federal bankruptcy courts of exemptions which were unconstitutional and ineffective in State courts would frustrate rather than facilitate the desired uniformity. The Congressional purpose of uniformity within States should override any technical quibbles about "State" versus "Federal" law in

the Bankruptcy Code. Therefore, if 31 O.S., supra, § 1(A)(20) is unconstitutional and ineffective in Oklahoma courts and Oklahoma execution proceedings, then it should be treated as unconstitutional and ineffective in bankruptcy cases in Federal courts in Oklahoma.

The Trustee argues that execution mechanisms for enforcement of contracts are part of the contracts themselves; and any subsequent limitation of those mechanisms is an impairment of the contracts themselves and, as such, beyond the constitutional power of a State, citing *Gunn v. Barry*, 15 Wall. 610, 21 L.Ed. 212 (1872); *Edwards v. Kearzy*, 96 U.S. 595, 24 L.Ed. 793 (1877). Debtor replies that the cases just cited have been modified by later decisions, citing *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934); *W.B. Worthen Co., v. Thomas*, 292 U.S. 426, 78 L.Ed. 1344 (1934); and *El Paso v. Simmons*, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446, and *Energy Reserves Group, Inc., v. The Kansas Power and Light Company*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). In an excellent brief (unfortunately marred by several obscure passages, especially in quotations, which seem to be typographical errors), Debtor reviews these cases in detail.

Generally,

Whenever the law is so changed that the means of enforcing the duty imposed by a contract are materially impaired, the obligation of the contract no longer remains the same,

16A AM.JUR.2D (2d ed. 1979) "Constitutional Law" § 698 p. 706:

The Federal Constitution's prohibition of legislation impairing the obligation of contracts is applicable to, and prohibitive of, legislation which effects impairment either by acting directly on the contract itself or by acting on the remedy; nothing is more material to the obligation of contract than the means of its enforcement. Thus, a diminution of the means of enforcement of a contract constitutes an impairment of the obligation of the contract within the meaning of the con-

stitutional prohibition. It is not always unconstitutional, however, for changes in statutory remedies to affect pre-existing contracts. During the early years when the contract clause was regarded as an absolute bar to any impairment, this result was reached by treating remedies in a manner distinct from substantive contract obligations. Yet it was also recognized very early that the distinction between remedies and obligations was not absolute. Impairment of a remedy was held to be unconstitutional if it effectively reduced the value of substantive contract rights. More recent decisions have not relied on the remedy/obligation distinction, primarily ... as ... the result of a more particularized inquiry into the legitimate expectations of the contracting parties. The parties may rely on the continued existence of adequate statutory remedies for enforcing their agreement, but they are unlikely to expect that state law will remain entirely static. Thus, a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement. Consequently, it is now established beyond question that the remedy within certain limits may be altered or modified, according to the will of the state, even though such statutes in certain cases may have a retrospective effect and to some extent incidentally affect vested rights, provided that a substantial means for enforcement remains and that the change of remedy is reasonable ...

... [S]ince it is a rule that existing remedies should be preserved in substance and with integrity and that no changes in remedies that materially lessen the value of the agreement or abridge, obstruct or unreasonably delay rights thereunder will be permitted, the power of the legislature to legislate in respect to remedies is not unlimited. Thus, for example, the legislature cannot ... take away a remedy by attachment after it has been established on a pre-existing debt. And the legislature may not so circumscribe an existing remedy with conditions and re-strictions as seriously to impair the value of the right.

16A AM.JUR.2D, supra, § 717–718, 720.

... [A] particular remedy existing at the time of the making of a contract may be abrogated altogether without impairing the obligation of the contract if another and equally adequate remedy for the enforcement of that obligation remains or is substituted for the one taken away.

16A AM.JUR.2D, supra, § 705 p. 721.

While it is conceded that a distinction exists between alterations of the remedy which are deemed to be legitimate and those which, under the form of modifying the remedy, impair substantial rights, generally speaking, the difficulties of stating a rule render it imperative that every case be determined on its own particular circumstances and the question whether in the last analysis a change of remedy impairs a substantial right is ordinarily one as to reasonableness. It has also been stated that whether changes affect the right is, in the end, a matter of degree, as to which there can be no rules.

A general test which is frequently used is that the obligation of a contract is impaired where ... the legal obligation is diminished ... by relaxing or abolishing the legal remedy, or the proceedings for enforcement are burdened with new conditions or restrictions. A more particular test frequently advanced is that only such ... changes of any of the remedies existing as to the enforcement of a contract as serve to lessen the value of the agreement or which substantially interfere with, abridge, obstruct, or unreasonably delay rights thereunder impair the obligation.

16A AM.JUR.2D, supra, § 707 pp. 724–725.

While there are some specific exceptions, it may be stated very broadly that the obligations of a contract is not unconstitutionally impaired by the adoption, amendment or repeal of statutes relating to such matters as ... executions against wages, earnings, or salaries, ... exemptions from claims of creditors ...

Certainly there is little question where such statutes operate prospectively only.

16A AM.JUR.2D, supra, § 712 p. 731–732.

Because of a broad dictum in a very early United States Supreme Court decision, some of the early state cases adopted the view that changes in exemption laws did not impair the obligation of contract ... However, subsequently the Federal Supreme Court adopted the view that a state statute ... which greatly increased the amount of an exemption not only impaired the obligation of a pre-existing judgment, but to all practical effects annihilated the remedy. Now the view squarely taken and generally accepted is that the remedy is inseparable from the contract itself and that statutes creating or enlarging exemptions substantially and materially are, as applied to pre-existing debts, unconstitutional as impairing the obligation of such contracts.

31 AM.JUR.2D (2d ed. 1967) "Exemptions" § 6 p. 335. These statements may be summarized as follows: modification of contractual enforcement remedies is an unconstitutional impairment of pre-existing contracts where the modification substantially enlarges the scope of exemption and thereby substantially reduces the "enforcement value" of the contract—and does so *unreasonably*. This Court now turns to those rules and authorities which, says Debtor, provide the current method for making these weighty estimations, mindful, however, that in this area rules are guides, and each case must ultimately be decided according to its unique circumstances.

■ The rule at present appears to involve a 3–step analysis, or a sequence of three tests. First, is there a substantial impairment? If there is, then second, does the State have a significant and legitimate public purpose to be accomplished by the impairment? If it does, then third, is the means of accomplishing this purpose reasonable and appropriate under the circumstances, giving due deference to legislative judgment in this regard?

First,

The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of the contractual relationship." *Allied Structural Steel Co. [v. Spannaus],* 438 U.S. at 244 [98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978)]. See *United States Trust Co.,* 431 U.S. [234], at 17 [97 S.Ct., at 1515]. The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected. *Allied Structural Steel Co.,* 438 U.S., at 245 [98 S.Ct., at 2723]. Total destruction of contractual expectations is not necessary for a finding of substantial impairment. *United States Trust Co.,* 431 U.S., at 26–27 [97 S.Ct., at 1519–20]. On the other hand, state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. *Id.,* at 31 [97 S.Ct., at 1522], citing *El Paso v. Simmons,* 379 U.S. 497, 515 [85 S.Ct. 577, 587, 13 L.Ed.2d 446] (1965). In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past. *Allied Structural Steel Co.,* 438 U.S., at 242, n. 13 [98 S.Ct. at 2721, n. 13], citing *Veix v. Sixth Ward Bldg. & Loan Assn.,* 310 U.S. 32, 38 [60 S.Ct. 792, 794, 84 L.Ed. 1061] (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic"). The Court long ago observed: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson Water Co. v. McCarter,* 209 U.S. 349, 357 [28 S.Ct. 529, 531, 52 L.Ed. 828 (1908).

*Energy Reserves Group v. Kansas Power & Light,* supra, 459 U.S. p. 411, 103 S.Ct. p. 704. By enacting 31 O.S., supra, § 1(A)(20), the Oklahoma Legislature has not completely eliminated all hope of successful execution on a judgment for breach of contract or failure to pay for goods or services rendered. But exemption of *all* retirement plans, without qualification,

does remove from creditors' reach an asset likely to be the debtor's single largest accumulation of cash—a highly desirable asset, not subject to depreciation, needing no upkeep or repair, requiring no repossession in the dead of night at risk of breach of the peace nor costly and uncertain liquidation by sale. Given that most debtors do not own spare, non-exempt tracts of land or vehicles free and clear, or other species of non-exempt assets, a bank account is often a levying creditor's only realistic hope for execution. The amount of money sheltered in a retirement plan or account can be quite large—even hundreds of thousands of dollars. Nor would a creditor reasonably expect to be barred from levying on bank accounts or other reserves of cash, readily available to the debtor for the debtor's own use yet not reasonably needed for debtor's support. As this Court observed in *In re Goldberg,* supra, such a restriction on execution is "unlikely" and not to be inferred from 60 O.S.1981 §§ 326–328 at least. The Court concludes that 31 O.S., supra, § 1(A)(20) as interpreted by Debtor does impair enforcement of the contract and to that extent does impair the contract itself; and such impairment is substantial.

Second,

If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, *United States Trust Co.,* 431 U.S., at 22 [97 S.Ct., at 1517], such as the remedying of a broad and general social or economic problem. *Allied Structural Steel Co.,* 438 U.S., at 247, 249 [98 S.Ct., at 2723–25]. Furthermore, since *Blaisdell,* the Court has indicated that the public purpose need not be addressed to an emergency or temporary situation. *United States Trust Co.,* 431 U.S., at 22, n. 19 [97 S.Ct. at 1518, n. 19]; *Veix v. Sixth Ward Bldg. & Loan Assn.,* 310 U.S., at 39–40 [60 S.Ct., at 795]. One legitimate state interest is the elimination of unforeseen windfall profits. *United States Trust Co.,* 431 U.S., at 31, n. 30 [97 S.Ct., at 1521]. The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests.

*Energy Reserves Group v. Kansas Power & Light,* 459 U.S. p. 411–412, 103 S.Ct. p. 704–05. Encouragement and protection of savings for support after retirement is a highly significant and perfectly legitimate public purpose. On the other hand, sheltering of well-heeled yet judgment-proof debtors who can ignore their responsibilities while keeping ready access to large cash reserves which are useable for any purpose but disguised as "retirement accounts," would be an illegitimate and reprehensible public purpose. This Court is loath to ascribe an illegitimate and reprehensible purpose to an enactment of the Oklahoma Legislature. This Court knows of no legislative history of 31 O.S., supra, § 1(A)(20), nor other direct evidence of the Oklahoma Legislature's purpose in enacting said statute. The Court can only regard the bare fact of the legislative enactment. Thus the question of legislative purpose merges with the question of legislative means. The Court therefore proceeds to the next test.

Finally,

Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *United States Trust Co.,* 431 U.S., at 22 [97 S.Ct., at 1517]. Unless the State itself is a contracting party, see *id.,* at 23 [97 S.Ct., at 1518], "[a]s is customary in reviewing economic and social regulation, ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.,* at 22–23 [97 S.Ct., at 1518].

*Energy Reserves Group v. Kansas Power & Light,* supra, 459 U.S. pp. 412–413, 103 S.Ct. p. 705.

Debtor cites *Neel v. First Federal Savings and Loan Association,* 207 Mont. 376, 675 P.2d 96 (1984) to the effect that, where the State is not a party to the contract in question, courts must defer abso-

lutely to the legislative judgment as to the necessity and reasonableness of a particular measure, effectively striking the third step or test in the analysis.

The supposed authority for this is *Energy Reserves Group v. Kansas Power & Light,* supra. In fact, the *Energy Reserves* opinion relies in this respect on *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), which relied in turn on *East New York Savings Bank v. Hahn,* 326 U.S. 230, 66 S.Ct. 69, 90 L.Ed. 34 (1945), which in turn cited and distinguished *W.B. Worthen Co. v. Kavanaugh,* 295 U.S. 56, 55 S.Ct. 555, 79 L.Ed. 1298 (1935). In the *W.B. Worthen Co.* case, the U.S. Supreme Court struck down a suite of foreclosure and redemption amendments which led to the "conviction that the framers of the amendments have put restraint aside ... [w]ith studied indifference to the interests of the mortgagee or to his appropriate protection," *W.B. Worthen Co. v. Kavanaugh,* supra, 295 U.S. p. 60, 55 S.Ct. p. 557. In the *East New York Bank v. Hahn* case the U.S. Supreme Court upheld a mortgage moratorium law where, "Unlike *Worthen Co. v. Kavanaugh,* 295 U.S. pp. 56, 60, 55 S.Ct. p.p. 555, 556, here there was no 'studied indifference to interests of the mortgagee or to his appropriated protection' ... The whole course of the ... moratorium legislation shows the empiric process of legislation at its fairest: frequent reconsideration, intensive study of the consequences of what has been done, readjustment to changing conditions, and safeguarding the future on the basis of responsible forecasts," *East New York Bank v. Hahn,* supra, 326 U.S. pp. 234–235, 66 S.Ct. p. 71. Neither of these authorities say anything about absolute deference by courts to the whim of the legislature, no matter how ill-explained or ill-advised.

A fair reading of the statement of the third test in *Energy Reserves Group v. Kansas Power & Light,* supra, indicates that the question of reasonable legislative means in Contract Clause cases should be treated somewhat like the question of reasonable legislative means in other cases wherein courts are asked to "review ...

economic and social legislation," *id.* In other such cases, courts are not expected to give absolute deference to legislative judgment. Legislative means must appear at least minimally reasonable to the courts in cases involving the police power, substantive due process, and equal protection, 16A AM.JUR.2D, supra, "Constitutional Law" §§ 384, 747–750, 752–753, 816. This is what one would expect, since courts of the United States do not abdicate decision of constitutional questions to the legislature, *Marbury v. Madison,* 1 Cranch 137, 175–180, 2 L.Ed. 60 (1803). Whether the level of reasonableness that must be met is exactly the same in police power, substantive due process, equal protection, and Contract Clause cases, need not be determined here. In Contract Clause cases, the true rule is that "[d]espite the customary deference courts give to state laws directed to social and economic problems, '[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption,'" whether or not the State be a party to the contract; but where the State is a party, the impairment must be "evaluat[ed] with particular scrutiny," *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978).

Even if blind deference were appropriate in some situations, it is not appropriate here, where estimation of legislative purpose (the second test) is impractical apart from evaluation of legislative means (the third test).

This Court declines to follow *Neel v. First Federal Savings and Loan Association,* supra. This Court will look at legislative enactments respectfully, but will not shut its eyes, *Marbury v. Madison,* supra, 1 Cranch p. 180.

■ Here, according to Debtor's interpretation of 31 O.S., supra, § 1(A)(20), the Oklahoma Legislature seems to have declared that all tax-qualified retirement plans and accounts are exempt from execution in enforcement of State court judg-

ments and from the beneficiaries' bankruptcy estates, regardless of whether the amount of money so reserved is more than is reasonably necessary for the beneficiaries' support, regardless of whether the beneficiaries have de facto control over and ready access to the funds for any purpose of their own, and even if the plan or accounts are otherwise-forbidden self-settled, revocable spendthrift trusts. This radical exemption is indeed "[s]ubject to the Uniform Fraudulent Transfer Act," 24 O.S.A. § 112 et seq.; but proof of fraudulent transfer under 24 O.S., supra, §§ 116, 117 is difficult and, in any event, the Uniform Fraudulent Transfer Act does not address the main difficulty, i.e., the maintenance of a bank account of any size which the account owner can use as he pleases but creditors cannot reach at all. For practical purposes, the only requirement for exemption is tax-qualified status. In effect, the Oklahoma Legislature has delegated determination of Oklahoma exemptions to the United States Congress, its tax laws and its lobbyists, who may well act without reference to the problems of adjustment of debtor-creditor relations in Oklahoma State courts or bankruptcy courts within Oklahoma. Insofar as an IRA is a self-settled, revocable spendthrift trust, and as such would be denied all protection under 60 O.S., supra, §§ 175.25, 326–328, *In re Goldberg*, supra, modification of these Oklahoma laws to afford *reasonable* protection to individuals relying on IRAs for *bona fide* retirement support would be a legitimate and commendable purpose. This purpose might have been sufficiently accomplished in various ways, e.g., by modifying 60 O.S.1981 § 175.25(G) insofar as it would apply to a self-settled spendthrift trust which is also a pension fund or retirement account having sufficient safeguards against beneficiary misuse as well as against creditor attachment; or by enacting a statute somewhat like present 11 U.S.C. § 522(d)(10)(E), which exempts "a payment under a stock bonus, pension, profit sharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor ..." But this purpose is far exceeded by 31 O.S., supra, § 1(A)(20), which protects virtually anything calling itself a retirement plan regardless of circumstances, and heedlessly demolishes (rather than carefully modifies) a traditional public policy disfavoring self-settled revocable spendthrift trusts. There is no evidence before the Court of what consideration, if any, the Oklahoma Legislature gave to the drastic effects of this new exemption statute. It does appear that the Oklahoma Legislature has acted with indifference to the interests of creditors or to their appropriate protection, *W.B. Worthen Co.*, supra. Here is no example of legislation at its fairest; here is no sign of intensive study of the consequences of what has been done, nor safeguarding the future on the basis of responsible forecasts, *East New York Bank v. Hahn*, supra. Here is a sweeping, heedless delegation, to a foreign Congress occupied with different concerns, of unqualified power to destroy a venerable and well-founded tradition guarding against abuse of spendthrift trusts, the practical consequence being that the United States Congress, in tinkering with its own tax laws, unknowingly grants a license to defraud creditors to citizens of the State of Oklahoma. These are not reasonable conditions, of a character appropriate to a legitimate purpose, *Energy Reserves Group v. Kansas Power & Light*, supra.

Therefore, 31 O.S., supra, § 1(A)(20) fails the third test under the above-cited cases, and must be held to be an impairment of the obligation of contracts, as to debts incurred before its enactment, in violation of the United States and Oklahoma Constitutions and therefore invalid to that extent.

After the matter at bar had been briefed and hearing held, the Oklahoma Supreme Court issued its opinion in *Greening Donald Co. Ltd. v. Oklahoma Wire Rope Products, Inc.*, 766 P.2d 970 (Okla.1988). In that case, involving a judgment creditor's attempt to garnish an IRA, the Oklahoma Supreme Court held that 60 O.S.1981 §§ 326–328 did exempt all funds in an IRA so long as the account remained in being

and retained tax-exempt status, notwithstanding its character as self-settled revocable spendthrift trust and the express prohibition of exemption thereof in 60 O.S. 1981 § 175.25(G). The Oklahoma Supreme Court's apparent interpretation and application of 60 O.S.1981 §§ 326–328 is "unlikely," *In re Goldberg*, supra, 59 B.R. p. 206. The Oklahoma Supreme Court's interpretation and application of 60 O.S.1981 § 175.25 in part IV of its opinion is even less likely: the *Greening* Court appears to say that, since self-settled spendthrift trusts are *forbidden,* a self-settled trust is not a spendthrift trust at all and is therefore *allowed*! This makes § 175.25 self-defeating, and is surely not what the Oklahoma Supreme Court meant; but what else it did mean is not clear to this Court. This Court declines to apply *Greening* retrospectively, for the same reasons that this Court declines to apply 31 O.S., supra, § 1(A)(20) retrospectively.

Whether 31 O.S., supra, § 1(A)(20) and 60 O.S.1981 §§ 175.25, 326–328 as interpreted in *Greening* are reasonable enough to be applied even prospectively are questions not before this Court at this time.

Whether the entire amount of the IRA herein should be used to pay claims of all creditors, or should be reserved for satisfaction of claims of only those creditors whose debts were incurred before April 16, 1987 and the balance returned to Debtor, or whether or to what extent the funds in the IRA should be charged with payment of administrative expenses, are questions not before this Court at this time.

Accordingly, the Trustee's motion for disallowance of claim of exemption in this IRA must be, and the same is hereby, GRANTED; and Debtor's claim of exemption of this IRA must be, and is hereby, DENIED and DISALLOWED.

AND IT IS SO ORDERED.